HIRAM SMITH ET UX *v.* GEORGE E. MEFFORD ET UX

5-4345 420 S. W. 2d 848

Opinion delivered November 27, 1967

*J. Marvin Holman,* for appellant.

*Edward H. Boyett,* for appellees.

LYLE BROWN, Justice. This is a boundary line case. Smith and Mefford orally agreed on a line. Smith purported to rescind the agreement and brought this suit to establish his title by deed and adverse possession. The chancellor denied relief to Smith, holding that the oral agreement fixed the common boundary. Appellant Smith here contends that the true boundary line was never in doubt; that there was no consideration; and that the agreement was rescinded by the parties.

In 1958 Hiram Smith bought the major portion of a forty-acre tract in Johnson County. His deed called for the west 33 acres. Shortly after June 1966, Mefford purchased the balance of the forty from Smith's neighbor. Mefford's deed called for the easterly seven acres. A survey made during the period of boundary line discussions disclosed a "short forty." That revelation made a contribution to the misunderstanding which brought about this litigation.

We start with the premise that a question developed between these neighbors about the location of the boundary line between their lands. It came about when Mefford approached Smith about straightening and rebuilding a meandering fence. Smith advised that he would first like to have a survey in order to put it on a straight line. Mefford testified that Smith stated the old fence was not actually on the line. Before the line was surveyed the two landowners, according to the surveyor, agreed that the fence would be established on the line determined by the surveyor to be the boundary. The surveyor determined the true boundary line to be several feet west of the old fence. That line would of course result in the loss of acreage by Smith, who had for some time occupied up to the old fence.

Smith was disappointed at the anticipated loss of acreage and in fact disputed the accuracy of the survey. Since Mefford would of course gain acreage on the basis of the survey, his first expression was they should abide by what he considered to be their agreement. Mefford, however, indicated that he would consider a compromise rather than the expense of a lawsuit. In fact, Mefford offered to pay Smith for the land between the old fence and the surveyed line, but Smith declined. It was then that the landowners, in the presence of the county surveyor, entered into an oral agreement advanced by Smith. He proposed that the boundary fence be constructed at a distance six feet east of the surveyed line; that Smith would furnish the wire and

the labor of himself and a helper; and that Mefford would furnish the posts and a laborer. Actually, the extra six feet would place the fence on a line where it had originally stood. Smith and the predecessor in title of Mefford had moved the fence to avoid a flooding problem. This is apparently the reason Smith thought he was entitled to the six feet; it strongly indicates Smith believed that line to be the true boundary—six feet east of the surveyor's line.

The day following the agreement on the line location the work was begun. Smith and two helpers started at the agreed south corner and proceeded, without incident, to set posts for a distance of approximately 300 feet. At that point and on the second day of work, Mefford arrived and complained that a straight line was not being followed, to his disadvantage. A heated argument ensued. Smith called off the work project and went home, declaring the agreement at an end. A few days later Mefford completed the project. However, the fence veered slightly to the west from the point where Smith stopped the work and came out on the north end some two feet from the northern point agreed upon. It was then that Smith filed this suit, claiming title by deed and by adverse possession to all lands inside the old irregular fence line.

The chancellor held that a boundary line had been agreed upon; that Mefford should be required to relocate that part of the fence which protruded over the "six-foot line"; that since Mefford supplied the shortage of posts, most of the labor and the wire, ownership of the fence should be vested in Mefford unless Smith shared the moving cost. The only exception made by the chancellor to the "six-foot line" was a few feet on the north end where a gully required a slight modification. That slight change is not here questioned. We hold that the chancellor's findings were in all respects correct.

Unfortunately, the need for straightening an irregular fence line developed into a dispute over the actual

property line. There were *three* possible true boundary lines: (1) the line from which Smith and Mefford's predecessor removed the boundary fence; (2) the irregular fence which Smith relied upon in his complaint; and (3) the line fixed by the county surveyor. In that situation our court has many times held that agreements between adjacent landowners as to their boundaries are encouraged. "Convenience, policy, necessity, justice, all unite in favor of such an amicable settlement." *Krutz* v. *Faught,* 204 Ark. 1036, 166 S. W. 2d 655 (1942). Settlement by parol agreement is valid on the principle that the agreement does not pass real estate from one party to another; it merely defines the boundary lines to which the respective deeds extend. *Sherman* v. *King,* 71 Ark. 248, 72 S. W. 571 (1903). Mutual concessions by the parties are sufficient consideration. *Randleman* v. *Taylor,* 94 Ark. 511, 127 S. W. 723 (1910).

In the fact situation before us, we find a state of uncertainty as to the true boundary line; that there was a bona fide dispute as to its location; and that the parties agreed on a dividing line. The beginning and ending points were marked. Labor and materials were advanced by the parties. Installation of the fence was started and posts were erected extending more than 300 feet.

Restatement, Contracts, § 196 (1) reads as follows: "An oral agreement between owners of adjoining tracts of land fixing a dividing boundary the location of which was honestly disputed, ceases to be within Class IV of § 178 [Statute of Frauds] and becomes enforceable when *the agreed boundary has been marked* or has been recognized in the subsequent use of the tracts, *or when other action has been taken by either party in reliance on the agreement.*" (Italics supplied.)

In *Sherman* v. *King,* 71 Ark. 248, 72 S. W. 571 (1903), there was an oral agreement as to a disputed boundary line. All elements of the agreement were performed except the removal "of that portion of the boundary fence that did not conform to the line estab-

lished between them by this agreement.'' This court held that Sherman could hold King to the agreement if he could prove that the land which Sherman sought to recover by suit was within the lines established by the agreement. The case was reversed for lack of sufficient proof on that point; however, this court's pronouncement became the rule of the case on remand.

In *Garvin* v. *Threlkeld,* 190 S. W. 1092 (Ky. 1917), it was said:

"While the validity of parol agreements to settle disputed boundaries was long resisted on the ground that, in effect, they passed the title to real property without the solemnities required by the statute, it is now settled that, where the dividing line is uncertain and there is a bona fide dispute as to its location and the parties agree on the dividing line and execute the agreement by marking the line or building a fence thereon, such an agreement is not prohibited by the statute of frauds, nor is it within the meaning of the provisions of the law that regulate the manner of conveying real estate."

The performances by the parties, which we have enumerated, bring the case within the law just recited. Therefore Smith could not rescind the contract by abandoning the construction of the fence.

Affirmed.

HARRIS, C. J. and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I respectfully dissent. The learned chancellor made a positive finding that the old fence line constituted a boundary by acquiescence for many years. This fact is undisputed. He did not make any finding that there was an uncertainty as to the dividing line nor did he find that a dispute as to its location existed between appellants and

appellees. I submit that the clear preponderance of the evidence is that there was no uncertainty or dispute as to this boundary line. One or the other is essential to any boundary by agreement.

Ollie Lindsey was the predecessor in title to appellants and her brother was predecessor in title to appellees. When she sold her property to Smith, he was put into possession up to the fence which had constituted the boundary between her and her brother for nearly forty years. She stated that so long as the fence had been there, there never had been any dispute about that being the property line.

Appellant Hiram Smith said that he took possession up to the fence and maintained it. He said that appellee Mefford recently asked if he would go in with him to build a new fence. Smith said that he then agreed to furnish the wire and one man and himself if Mefford would furnish the posts and one man and they would try to *straighten out the old fence*. His intention was to build a new fence as near as possible to the old fence but to make it straight. He and Tate, the county surveyor, agree that Tate was called to make a survey only because the parties wanted to build a straight fence. While Mefford says the surveyor was called to establish the property line, he admits that Smith called him. Mefford does not even say that the surveyor was to establish a new property line. He does claim that Smith said he was going to have the property surveyed and "make a line fence of it."

Mefford does not contradict Smith about the agreement as to building the fence, but he affirmatively answers leading questions as to whether there was a dispute about the line. He never stated what the dispute was. He admits that all he wanted to do was straighten out the old fence and that he didn't claim to own anything west of it. He said that Smith told him that he could not straghten up the old fence because it was not on the line. On redirect examination Mefford said that

*Smith* admitted that he didn't own *up to the fence* and knew it wasn't on the line. This certainly was not a dispute. Appellee Mefford *admits* that there was no dispute about the property line until it was surveyed. Then he says it was not until the new fence was half-built. So there was no *dispute* about the *location* of the boundary line. Even after Tate's *admittedly erroneous* survey, Mefford tried to buy the strip of land between the old fence and the survey line from Smith.[1] Although there is testimony that the parties first agreed to build the new fence on the erroneous survey line, and later agreed to build six feet east of the survey line, there is *no* testimony about a dispute until the fence was actually commenced. I respectfully submit that this background will not support an "agreed boundary" and that consequently the court's decree should fall.

The rules as to "agreed boundaries" in Arkansas have been stated and restated dozens of times. They were set out in *Clauss* v. *Baumgartner,* 227 Ark. 1080, 305 S. W. 2d 116, which quoted from *Malone* v. *Mobbs,* 102 Ark. 542, 145 S. W. 193, 146 S. W. 143, as follows:

> "In the case of *Payne* v. *McBride,* 96 Ark. 168, we held: 'Where there is doubt, dispute or uncertainty as to the true location of the boundary line the parties may by parol fix a line which will, at least when followed by possession with reference to the boundary so fixed, be conclusive upon them although the possession is not for the full statutory period.' To the same effect is *O'Neal* v. *Ross,* 100 Ark. 555, 140 S. W. 743; *Butler* v. *Hines,* 101 Ark. 409, 142 S. W. 509."

In *Randleman* v. *Taylor,* 94 Ark. 511, 127 S. W. 723, this court said:

---

[1]The surveyor said that the line would have been close to the old fence if he had located it correctly. His error was due to his failure to recognize that the tracts were in a "short forty."

"* * * It is only where the true line is unknown or is difficult of ascertainment, and the parties establish the line to settle a disputed and vexatious question as to the boundary line between them, that the agreement is binding."

Here there is lacking another important element in the establishment of this type of boundary. The parties certainly never went into possession of their respective lands according to the agreement. The filing of this lawsuit was the immediate outgrowth of appellees' building or completing of the fence. I do not believe that it can be seriously urged that the unilateral possession of Mefford meets the test. While the adoption of a new rule validating these agreements when the boundary has only been marked, or other action taken pursuant to the agreement by the parties might be thought by some to be wise, I do not think so. We have always followed the rule that parol agreements relating to boundaries, even when made under the required circumstances, must be carried into execution in order to be binding upon the parties. In *Stroud* v. *Snow*, 186 Ark. 550, 54 S. W. 2d 693, this court reversed a jury verdict based on such an agreement because of the court's error in instructing the jury that just such an agreement as Mefford alleges was made in this case was sufficient. There the evidence was that appellant agreed that when the line was run by the county surveyor, he would put his fence back on the true line and reiterated his agreement *when the line was run*. There this court said:

"* * * The jury found for the defendant and settled the disputed question of fact against the appellant, so that we must treat the agreement as established. This presents the single question, is the agreement sufficient to divest the title to the land in controversy acquired by lapse of time and the adverse possession of the appellant beyond the statutory period? The general rule is stated in 2 C. J., § 559, p. 256, as follows: 'A title which has ripened by adverse possession cannot be divested by

parol abandonment or relinquishment, but must be transferred by deed.' This rule is recognized by this court in *Hudson* v. *Stillwell,* 80 Ark. 575-578, 98 S. W. 356, where we said: 'If the occupancy was adverse for the statuory period, it operated as a complete investiture of title, and a subsequent executory agreement to readjust the boundary lines or any other act done in recognition of the validity of plaintiff's claim to the land would not remove the statute bar and reinvest the title.' To the same effect are the decisions in *Parham* v. *Dedman,* 66 Ark. 26, 48 S. W. 673; *Shirey* v. *Whitlow,* 80 Ark. 444, 97 S. W. 444; *O'Neal* v. *Ross,* 100 Ark. 560, 140 S. W. 743; *Hutt* v. *Smith,* 118 Ark. 10, 175 S. W. 399; *Blackburn* v. *Coffee,* 142 Ark. 430, 218 S. W. 836; *Dermott* v. *Stinson,* 144 Ark. 208, 222 S. W. 54, cited by the appellee.

In the recent case of *Haskins* v. *Talley,* decided by the Supreme Court of New Mexico, November 17, 1923, and reported in 29 N. M. 173, 220 Pac., at page 1007, our cases are reviewed, and the doctrine therein announced is approved as the general rule. See also *Lusk* v. *Yankton,* 40 S. D. 498, 168 N. W. 375.''

The court then goes on to reverse on the basis that the contract was executory, not executed. I submit that, until this fence was built by the parties and the extent of their right of possession delineated by it, the contract was still executory.

The majority implies that the only reason for the distinction is that the executed agreement takes the case out of the statute of frauds. This assumption seems unfounded to me. We have repeatedly held that boundary agreements are not contracts for the sale or conveyance of lands or any interest therein. See, *Sherman* v. *King,* 71 Ark. 248, 72 S. W. 571; *Payne* v. *McBride,* 96 Ark. 168, 131 S. W. 463; *Sherrin* v. *Coffman,* 143 Ark. 8, 219 S. W. 348; *Robinson* v. *Gaylord,* 182 Ark. 849, 33 S. W.

2d 710. The *Sherrin* case states the rule as clearly as it could be stated:

"The agreements in cases of this kind do not operate as a conveyance, so as to pass title from one to another, but they proceed upon the theory that the true boundary line is in dispute, and that the agreement serves to fix the true line to which the title of each extends. The parties thereafter hold up to the line as they did before by virtue of their respective deeds. The theory is that the parties have simply by agreement settled the location of their boundary lines, which was in doubt, instead of having the court settle it for them. So when they orally agree upon the line, and the agreement is accompanied by possession to the agreed lines, such agreement will be valid and binding."

In the *Robinson* case this court quoted the United States Supreme Court's statement, "that such agreement is 'not a contract for the sale or conveyance of lands. It has no ingredient of such a contract.' " In view of these holdings, a simple reading of the statute of frauds [Ark. Stat. Ann. § 38-101 (Repl. 1962)] shows conclusively that it could not have any application because this is not an action "* * * to charge any person upon any contract for the sale of lands, tenements and hereditaments, or any interest concerning them; * * * ." This view is supported by an overwhelming weight of authority. See, 12 Am. Jur. 2d 619, Boundaries, § 84.

Even if the statute of frauds could be said to apply, there is no evidentiary basis here for taking the case out of the application of this statute. The agreement about the method of construction of the fence was entered into before any dispute arose. Smith says it was made when Mefford first came to him and when their only objective was to straighten out the fence. Mefford does not contradict him and agrees with him as to the

substance of that agreement. As hereinabove pointed out, even Mefford does not contend that there was a dispute about the boundary before the fence was half-built. Consequently, the agreement as to contributions to the fence building did not constitute any part of a boundary agreement, or any such "part performance" as to take the case out of the statute of frauds. Certainly it did not make the agreement an executed one.

In *Sherrin* v. *Coffman, supra,* the court again pointed out that the binding effect of these agreements depended upon their execution. There it was said that the request of an adjoining owner to remove a house from the disputed strip falls short of establishing an agreement or the execution thereof. The validity of this rule distinguishing executory and executed contracts was recognized in *Dewees* v. *Logue,* 208 Ark. 79, 185 S. W. 2d 85, and *Adkins* v. *Willis,* 217 Ark. 287, 230 S. W. 2d 32.

Perhaps basically my disagreement with the majority is based upon a different understanding of the facts. In addition to the matters already pointed out, the majority states that the surveyor determined the true boundary line to be several feet west of the old fence. I do not so understand the testimony. The surveyor said that the line run by him was erroneous and that if he had run it correctly, it would have been very nearly the old fence line. Mefford recognized this and offered to *purchase* the strip between the surveyor's line and the old fence line.

In setting up what is asserted to be the uncertainty as to the boundary line, the majority refers to three possible lines. I have already pointed out the fallacy of relying on the surveyor's line as a possible line. I do not understand the significance of a line from which Smith's and Mefford's predecessors in title removed a boundary fence forty years ago. The fact that this was intended

as a "swap" or "conveyance" between a brother and sister is inescapable. When these two possibilities are elminated, only one possible line remained. The fence to which both Smith and Mefford took possession was so conclusively the boundary between the two tracts that the chancellor correctly foreclosed the presentation of any further testimony on that subject.

I would reverse and remand with directions to the court to grant the relief sought by appellants.

I am authorized to state that Harris, C. J., joins in this dissent.